**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __ 4/8/2020

MAYRA DIAZ,

                              **Plaintiff,**

              -against-

COMMISSIONER OF SOCIAL SECURITY,

                              **Defendant.**

-------------------------------------------------------------------X

**18-CV-8643 (SN)**

**OPINION & ORDER**

**SARAH NETBURN, United States Magistrate Judge.**

    *Pro se* Plaintiff Mayra Diaz ("Diaz") brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the final determination of the Commissioner of Social Security (the "Commissioner") denying her application for Supplemental Security Income ("SSI"). The Commissioner moves for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) to uphold the Commissioner's determination and dismiss the case. Because I find that the administrative law judge ("ALJ") failed to apply the treating physician rule correctly, Diaz's motion for judgment on the pleadings is GRANTED, the Commissioner's denial of benefits is VACATED, the Commissioner's cross-motion for judgment on the pleadings is DENIED, and the case is REMANDED for proceedings consistent with this order and opinion.

# BACKGROUND

## I. Plaintiff's Medical History

### A. Treatment Records

#### 1. Crystal Run Healthcare

##### a. Dr. Arthur Tolis

On February 4, 2014, Diaz saw Dr. Arthur Tolis at Crystal Run Healthcare to establish primary care. Administrative Record (ECF No. 12 [hereinafter, "AR"]) at 364-74.[1] Diaz's initial physical examination showed that she had lungs clear to auscultation and normal respiratory function, regular heart rhythm, normal range of motion, muscle strength, stability in her extremities, intact memory, and appropriate mood and affect. Id. at 372. Diaz saw Dr. Tolis next on May 9, 2014, for a follow-up visit, at which time a physical examination revealed normal findings in all examined areas, and at which Diaz denied asthma symptoms and reported she was "doing well" regarding her sleep apnea. Id. at 366.

Approximately two years later, on May 26, 2016, Diaz saw Dr. Tolis for reported anxiety. Id. at 462-65. Dr. Tolis performed a physical examination and found Diaz was not in acute distress, and had normal auscultation, regular heart rate and rhythm, and that Diaz was fully oriented with appropriate mood and affect, as well as normal memory. Id. 464. Dr. Tolis also noted that Diaz reported difficulty sleeping, joint pain, anxiety, depression, difficulty concentrating, and excessive worry. Id. at 463. On June 24, 2016, Diaz visited Dr. Tolis for a follow-up appointment and reported feeling "a bit better" regarding her anxiety. Id. at 458-61. Diaz was fully oriented and had appropriate mood and affect. Id. at 459. On July 5, 2016, Dr. Tolis completed a questionnaire, "Physical Assessment for Determination of Employability," in which he opined that Diaz was limited to sedentary physical exertion and could not work due to

---

[1] Citations are to the original page numbers of the Administrative Record.

her depression and anxiety. Id. at 441-42. Dr. Tolis also noted that Diaz had chronic

fibromyalgia. Id. at 442. Dr. Tolis had also written a letter (addressed "To Whom It May

Concern"), dated January 21, 2016, stating that Diaz was unable to work due to fibromyalgia

with chronic pain. Id. at 440.

Dr. Tolis completed a second questionnaire on October 18, 2016, in which he noted Diaz

had been diagnosed with depression and fibromyalgia, that she had a flat affect, was easily

distracted, could walk five blocks before needing rest, and could only sit for 45 minutes at a time

and stand for 30 minutes at a time. Id. at 614-15. Diaz could stand or walk for about four hours

total, and sit for at least six hours total, in an eight-hour workday. Id. She needed to change

positions at will and take walking breaks every 90 minutes. Id. Diaz would also need about three

unscheduled, 15-minute breaks per day. Id. at 616. She did not require a cane to ambulate. Id.

She could frequently lift and carry less than 10 pounds and occasionally lift and carry 10 pounds.

Id. She could rarely twist and crouch or squat, occasionally stoop (bend) or climb stairs, and

never climb ladders. Id. She had no limitations with reaching, handling, or fingering. Id. at 617.

She would be off-task more than 25% of the workday and she was capable of low-stress work.

Id. At the request of the ALJ, Dr. Tolis clarified that he based his opinions on Diaz's treatment

notes and symptoms, and that he did not test for lifting and prolonged walking. Id. at 620. Dr.

Tolis stated that Diaz's chronic pain limited her mobility, and that his estimation of her

limitations was based on her symptoms, daily routine, and reported activities. Id. at 621.

### b. Dr. Nancy Linneman

Diaz saw Dr. Nancy Linneman beginning in at least 2013 for treatment of sleep apnea

and asthma. AR at 275-279. On April 16, 2014, Diaz saw Dr. Linneman for follow-up treatment

after her primary care physical. Id. at 263-66. Upon examination, Dr. Linneman noted that

Diaz's chest was symmetric and her lungs were clear to auscultation, though Diaz had a "very crowded airway." Id. at 264. Dr. Linneman noted that Diaz had adequate sleep time as well as "excellent" CPAP compliance and clinical results for treatment of her sleep apnea. Id. Diaz saw Dr. Linneman again on September 25, 2015, for additional follow-up care related to asthma, obesity, and sleep apnea. Id. at 498-502. A physical examination revealed a crowded airway and obesity, but otherwise normal results including normal auscultation. Id. at 500. Diaz reported only using her CPAP machine one or twice per week, but also denied any limitations in activities of daily living due to respiratory issues. Id. at 498.

### c. Dr. James McLaughlin

Diaz also saw cardiologist Dr. James McLaughlin for cardiac follow-up treatment after her initial primary care physical. AR at 331-33. At an appointment on May 1, 2014, Diaz reported chest pain and burning while lying in bed. Id. A physical examination revealed Diaz was not in acute distress, that she had non-labored respirations, clear breath sounds and percussion, and regular heart rhythm and sounds. Id. at 332. Diaz returned for a follow-up with Dr. McLaughlin on July 9, 2015. Id. at 515-21. Diaz reported chest pain but rated her pain "0/10." Id. at 515, 517. Diaz also saw Dr. McLaughlin on January 19, 2016, and reported soreness and a "thump" in her chest at nighttime. Id. at 491-494. Diaz also reported that she was unable to walk on the treadmill due to hip pain. Id. at 491. Diaz's physical examination findings were normal. Id. at 492-93.

Diaz saw Dr. McLaughlin again on February 22, 2016. Id. at 476-48. Dr. McLaughlin reviewed Diaz's February 11, 2016 myocardial perfusion image and Holter Report, noting that the diagnostic was normal (showing no definite evidence of ischemia) and that the Holter Report was also normal. Id. at 476-80, 482-83, 536-38, 546. Dr. McLaughlin performed a physical

examination on February 22, 2016, and reported normal findings including normal auscultation and regular heart rate and rhythm. Id. at 478.

### d. Dr. Andrew Faskowitz

In October 2012, Diaz began receiving care from neurologist and pain management specialist Dr. Andrew Faskowitz for reported back pain, head pain, and neck pain. Id. at 386. Diaz also saw Dr. Faskowitz for follow-up care on June 20, 2014, at which time Dr. Faskowitz observed that a November 2012 electromyography and nerve condition study showed Diaz had mild right carpal tunnel syndrome ("CTS") and chronic right L4 and L5 radiculopathies. Id. Dr. Faskowitz also observed that a January 2012 lumbar spine MRI showed no significant disc herniations or thecal sac impingement. Id. He further noted chronic neck and back spasms, and prescribed Skelaxin accordingly. Id. A physical examination showed that Diaz was not in apparent distress and that she had an antalgic gait, no sensory loss, and normal motor strength. Id. at 388. Diaz saw Dr. Faskowitz again on July 17, 2014, and reported that her Lyrica and Skelaxin were working albeit with side effects. Id. at 383-85. Diaz reported that her pain was under "excellent" control but that she had balance problems. Id. at 383. A physical examination showed that Diaz had normal strength and sensation, and was normal in all other examined areas, except that Diaz had an antalgic gait. Id. at 384. Diaz saw Dr. Faskowitz again on December 18, 2015, for a follow-up appointment. Id. at 495-97. A physical examination revealed that Diaz was not in apparent distress and had normal motor strength and sensation, no sensory loss, an antalgic gait, and no evidence of cognitive loss or aphasia. Id. at 496-97.

Dr. Faskowitz completed three questionnaires regarding Diaz's health and functional abilities. According to the first questionnaire, dated March 15, 2015, Diaz could occasionally lift and carry up to 10 pounds, sit for two hours at a time, stand for 15 minutes as a time, and walk

for 15 minutes at a time. Id. at 432-33. Diaz needed a cane to ambulate and could not carry small objects with her free hand. Id. at 433. She could occasionally reach, handle, finger, feel, push, and pull with her hands but could never operate foot controls. Id. at 434. She could frequently climb ramps and stairs with a cane, but could never climb ladders or scaffolds, balance (without a cane), stoop, kneel, crouch, or crawl. Id. at 435. Her vision was affected sometimes by her migraines, though she could view a computer screen and determine the shapes and colors of objects. Id. Diaz could not be exposed to unprotected heights, moving mechanical parts, humidity and wetness, dusts, odors, fumes, pulmonary irritants, extreme cold or heat, or vibrations; and could not operate a motor vehicle. Id. at 436. Diaz could not walk one block at a reasonable pace on rough or uneven surfaces, or climb a few steps at a reasonable pace without using a handrail. Id. at 437. She could, however, shop, travel without a companion, use public transportation, prepare a simple meal and feed herself, care for her personal needs, and handle papers and files. Id.

In the second questionnaire, a "Fibromyalgia Medical Source Statement" dated September 6, 2016, Dr. Faskowitz opined that Diaz met the diagnostic criteria for fibromyalgia. Id. at 582. According to the questionnaire, Diaz experienced pain in the lumbosacral, thoracic, and cervical spine, chest, shoulders, arms, hand/fingers, hips, legs, knees, ankles, and feet. Id. at 583. Diaz was treating with Lyrica and Skelaxin as needed and she did not have the stamina to work a full-time job. Id. at 584. She needed to change positions at will and needed 10-minute walking periods every 90 minutes. Id. at 585. Due to muscle weakness, chronic fatigue, pain, and adverse effects of medication, she also needed approximately eight to ten "unscheduled" breaks a day of about one hour each. Id. Diaz could use her hands for grasping, turning, and twisting objects about 20% of the day, and her arms for reaching in front of the body for about 20% of the

day. Id. Dr. Faskowitz noted that Diaz would be "off-task" approximately 25% of the day and was incapable of even a "low stress" job, and that Diaz was in severe pain "24/7." Id. at 584, 586.

Finally, by undated questionnaire entitled, "Physical Medical Source Statement," Dr. Faskowitz stated that Diaz had fibromyalgia, cognitive disfunction, muscle pain and weakness, dizziness, frequent severe headaches, and shortness of breath. Id. at 587. In Dr. Faskowitz's opinion, Diaz therefore needed a job that permitted shifting positions at will, walking for 10 minutes every 90 minutes, as well as taking 8-10 one-hour breaks per day. Id. at 589-90. Dr. Faskowitz stated that Diaz could rarely lift and carry less than 10 pounds, twist, stoop, crouch, squat, or climb ladders or stairs. Id. at 590. Diaz could grasp, turn or twist objects 20% of the day, and reach overhead 10% of the day. Id. at 591. She would be off-task more than 25% of the day, and was incapable of performing even low-stress work. Id.

### e. Dr. Edward Croen

Diaz visited Dr. Edward Croen ("Dr. Croen") complaining of abdominal pain on June 22, 2015. Id. at 522-25. Physical examination findings were normal, except that Diaz had "inappropriate mood and [a]ffect." Id. at 525. On March 3, 2016, Dr. Croen noted that Diaz's abdominal symptoms had improved with Miralax, although she had diarrhea every several weeks. Id. at 469-73. A physical examination on that date also revealed normal findings except that Diaz had "inappropriate mood and [a]ffect." Id. at 472. Again, on June 30, 2016, Diaz saw Dr. Croen and reported that she had been without medication for two months due to problems with her insurance and that she had daily symptoms of heartburn and bloating. Id. at 453-56. Physical examination findings were normal. Id. at 456.

#### f. Other Tests and Diagnostics

Diaz had a brain MRI on August 14, 2014, which was normal. Id. at 407. On July 9, 2015, and again on February 11, 2016, transthoracic echocardiograms showed normal left ventricle size and systolic function. Id. at 536-42. On August 15, 2016, Diaz also had a normal echocardiogram. Id. at 449-52.

### 2. Consultative Examiner Dr. Greg Grabon

On November 7, 2014, Diaz saw Dr. Gregory Grabon ("Dr. Grabon") for a consultative internal examination. Id. at 422-30. Diaz reported pain in her neck and back, and tingling and numbness in her feet, following a motor vehicle accident on July 4, 2011. Id. at 422. Diaz also reported fibromyalgia, balance disorder, CTS, cataracts, and sinusitis. Id.

Dr. Grabon performed a physical exam and found that Diaz was in no acute distress, and had a wide-based and waddling gait, difficulty walking on her heels because of waddling, and loss of balance. Id. at 423. Diaz could squat only to 40 degrees due to pain, though she had a normal stance. Id. Diaz could rise from a chair without difficulty, and did not need help changing for the examination or getting on and off the table. Id. at 424. Examination of Diaz's chest showed lungs clear to auscultation with normal percussion. Id. Diaz had normal heart rhythm, with no murmur gallop or rub audible. Id. Diaz's cervical spine flexion and extension were to 30 degrees bilaterally, lateral flexion was to 30 degrees bilaterally, and rotation was to 60 degrees bilaterally. Id. Diaz had full range of motion in her shoulders, elbows, forearms, wrists, hips, knees, and ankles. Id. Her joints were stable and nontender, with no evident subluxations, contractures, anklyosis, or "thickening." Id. Dr. Grabon noted that Diaz had a mild limitation to "bending, lifting, prolonged standing, prolonged ambulation, excessive head or neck twisting or turning." Id. at 425. Dr. Grabon also noted that Diaz should "avoid climbing heights or other

known activities that require balance" and that she should also "avoid dust, smoke, or other known respiratory irritants." Id. at 425-26. Diaz also reported that she cooked five times per week, cleaned weekly, washed laundry weekly, shopped monthly, and bathed and dressed herself daily. Id. at 423.

### 3. Hudson Valley Center for Development

#### a. LMHC Kristen Nasta

On February 5, 2016, Diaz had an initial visit with Licensed Mental Health Counsel Kristen Nasta ("LMHC Nasta") at Hudson Valley Center for Development to address recurring nightmares. AR at 595. Diaz met with LMHC Nasta through September 2016, to discuss nightmares, past loss and trauma, her housing situation, and stress. See id. at 595-610. On June 3, 2016, LMHC Nasta completed a questionnaire, "Psychiatric Assessment for Determination of Employability." Id. at 438-39. LMHC Nasta opined that Diaz was "not capable" of work activity due to her physical limitations, and that Diaz's impairments frequently interfered with her daily living activities. Id. at 439. According to LMHC Nasta, Diaz was able to maintain hygiene and personal grooming standards. Id. LMHC Nasta listed generalized anxiety disorder and depressive disorder as Diaz's psychiatric diagnoses. Id. at 438. In addition, LMHC Nasta noted that Diaz was moderately limited in her ability to understand and remember both simple and complex instructions, maintain socially appropriate behavior, use public transportation, and interact with others. Id. at 439. LMHC Nasta also stated that Diaz was very limited in maintaining attention and concentration and performing low-stress, simple tasks. Id.

LMHC Nasta completed a request for clarification at the behest of the ALJ in connection with Diaz's SSI application, in which she stated that "no formal tests [were] done" and "no evaluations [were] formally completed" in her assessment of Diaz. Id. at 624-27. LMHC Nasta

also noted that Diaz "consistently . . . reported verbally that she is unable to perform employment tasks without significant distress and physical pain." Id. at 625. Diaz also reported high levels of social anxiety, and health problems, as well as "daily and chronic anxiety and depression" significantly impacting her daily functioning. Id. at 626.

**B. Non-Medical and Testimonial Evidence**

Diaz was born in 1966 and was 47 years old at the time of her SSI application. AR at 144. She completed school through the 12th grade and has not worked since June 2014. Id. at 171-72. Diaz completed an adult function report, in which she stated that she lived with her sister and brother-in-law. Id. at 182, 186. Diaz reported doing household chores, including cleaning the kitchen and bathroom, raking outside (with difficulty), sweeping, preparing "most of" her own meals, and washing laundry. Id. at 183-185. She also helped care for a dog by feeding, washing, and walking it. Id. Diaz complained of difficulty sleeping and caring for her personal needs, and needed reminders to take medications. Id. at 183-84. Her hobbies included watching television, reading, doing puzzles, and playing solitaire. Id. at 186. She stated that she attended church and walked to the post office on a regular basis. Id. at 187. Diaz also reported significant difficulty lifting, standing, walking, sitting, climbing stairs, kneeling, squatting, reaching, using her hands, seeing, hearing, talking, and remembering things. Id. at 190.

**II. Application for Benefits**

On June 23, 2014, Diaz applied for SSI, alleging her inability to work beginning June 23, 2014, due to "thyroid disease," palpitations, fibromyalgia, nerve conditions, bilateral carpal tunnel syndrome, obstructive sleep apnea, breathing problems, herniated neck and back, "dry eye disease," cataracts, sinusitis, a pinched nerve, spasms, balance disorder, and "stenosis of carotid

artery." AR at 15, 144-49, 171. This application was initially denied on November 14, 2014. Id. at 76.

Diaz requested a hearing after her initial application for benefits was denied. Id. at 76. ALJ Robert Gonzalez conducted a hearing on September 9, 2016. Id. at 35-58. At the hearing, Diaz testified that since 2014, she had lived with her sister and her sister's husband, supporting herself through a combination of personal savings, public benefits, prior income from work as a babysitter, and prior income from work for the County of Orange Board of Elections. Id. at 38-41. Regarding her health, Diaz testified that she experienced significant pain in her back, shoulders, head, hips and wrists, as well as "24/7" pain in her neck. Id. at 42-43. Diaz also noted that she experienced numbness in her ankles and hands, as well as carpal tunnel in both hands. Id. at 43-45. Diaz explained she was diagnosed with fibromyalgia and that she suffered sinusitis and intense migraines. Id. at 42-43, 47-48. Diaz used a prescribed cane to address a balance disorder and dizzy spells, which she experienced for up to ten minutes, two to four times a day, although she also stated that stiffness in her arm and numbness in her hand and fingers made use of the cane more difficult. Id. at 44-45. She testified further that she experienced "mind fog," or a loss of clarity or concentration that precluded her from focusing and working for extended periods of time, and had been diagnosed with depression and anxiety. Id. at 42-43, 46. Due to her conditions, Diaz stated she had difficulty doing sustained work at a desk, such as sitting and reading or using a computer. Id. at 42-43. She also testified that she could not sit for longer than two hours, walk for more than 200 feet, lift more than 10 pounds, or stand for longer than 15 minutes without becoming uncomfortable or experiencing pain. Id. at 47.

Diaz testified that since she applied for Social Security Benefits on June 23, 2014, she had continued to see medical providers at Crystal Run Healthcare to address her health needs. Id.

at 41. Diaz had seen an internal physician, Dr. Arthur Tolis, for treatment of thyroid disease, depression, and anxiety; a gastroenterologist, Dr. Edward Croen, for a colonoscopy and two endoscopies; a pain management neurologist, Dr. Andrew Faskowitz; and a cardiologist, Dr. James McLaughlin. Id. at 41-42. Diaz had also seen a mental health therapist at Hudson Valley Development Center. Id. at 57. Diaz indicated that she had been prescribed Lyrica and Skelaxin and had taken both for nearly two and half years for pain reduction, and that, while somewhat effective at reducing pain, the medications ultimately only subdued or delayed the onset of more serious pain. Id. at 43-44. Diaz had also been prescribed and was taking: Synthroid for hypothyroidism, QVAR (an inhaler) for preventative respiratory care and sleep apnea, omeprazole and laxatives for stomach pain and bloating, Wellbutrin for anxiety and depression, acetaminophen, and vitamin D supplements. Id. at 45-47.

A vocational expert ("VE") also testified at the hearing. Id. at 48-58, 218-19. The ALJ asked the VE to assume a hypothetical individual with the same age, education, work history, and residual functional capacity as Diaz. Id. at 49-50. The VE testified that such an individual could perform light, unskilled work existing in significant numbers in the national economy. Id. at 50. Specifically, the VE identified the following jobs as suitable: "mail clerk" (102,000 jobs in the national economy), "office helper" (76,000 jobs in the national economy), "photocopy machine operator" (18,000 jobs in the national economy), and "marker" (50,000 jobs in the national economy). Id.

The ALJ issued a decision on June 27, 2017, holding that Diaz was not disabled within the meaning of the Social Security Act according to an evaluation pursuant to the five-step analysis under 20 C.F.R. § 416.920(a). Id. at 12-32. On August 20, 2018, the Appeals Council denied Diaz's request for review. Id. at 1. Diaz subsequently filed this case challenging the

Commissioner's denial of her application for SSI, seeking reversal and remand, on September 20, 2018. ECF No. 2.

## DISCUSSION

### I. Governing Law

#### A. Substantial Evidence Standard

A motion for judgment on the pleadings under Rule 12(c) should be granted if it is clear from the pleadings that "the moving party is entitled to judgment as a matter of law." Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am. (UPGWA) & Its Local 537, 47 F.3d 14, 16 (2d Cir. 1995). In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Commissioner's determination may be set aside only if "it is based upon legal error or is not supported by substantial evidence." Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998)). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995); accord Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991). Where, as here, a plaintiff proceeds *pro se*, the court should "read [her] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994) (citing Mikinberg v. Baltic S.S. Co., 988 F.2d 327, 330 (2d Cir. 1993)).

## B. Five-Step Disability Determination

A claimant is disabled under the Social Security Act if she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. §§ 423(d)(3), 1382c(a)(3)(D). A claimant will be determined to be disabled only if the "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Social Security Administration has established a five-step sequential evaluation process for making disability determinations. See 20 C.F.R. § 416.920. The steps are followed in order: if it is determined that the claimant is not disabled at a step of the evaluation process, the evaluation will not progress to the next step. The Court of Appeals has described the process as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1. . .. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

Jasinski v. Barnhart, 341 F.3d 182, 183-84 (2d Cir. 2003) (quoting Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999)). "The claimant bears the burden of proof in the first four steps of the sequential inquiry; the Commissioner bears the burden in the last." Selian v. Astrue, 708 F.3d 409, 418 (2d Cir. 2013).

## 1. Step One

At step one, the Commissioner determines whether the claimant is currently engaged in substantial gainful employment. 20 C.F.R. § 416.920(a)(4)(i). If the claimant is engaged in substantial gainful activity, then his or her claim will be denied "regardless of [the claimant's] medical condition or [his or her] age, education, and work experience." 20 C.F.R. § 416.920(b). If the claimant is not engaged in substantial gainful employment, the Commissioner will proceed to step two.

## 2. Step Two

At step two, the Commissioner determines whether the claimant has a "severe medically determinable physical or mental impairment" or a "combination of impairments that is severe and meets [the SSA's] duration requirement." 20 C.F.R. § 416.920(a)(4)(ii). A severe impairment "must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques," 20 CFR § 416.921, and must "significantly limit [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R § 416.922(a). Basic work activities include physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; ability to see, hear, and speak; ability to understand, perform, and remember simple instructions; use of judgment; appropriate response to supervision, co-workers, and usual work situations; and ability to adjust to changes in a "routine work setting." 20 C.F.R. § 416.922(b).

In determining whether a claimant's physical or mental impairments are of "sufficient medical severity," the Commissioner "will consider the combined effect of all [the claimant's] impairments without regard to whether any [particular] impairment ... would be of sufficient severity." 20 C.F.R. § 416.923(c). In assessing severity, the Commissioner will not consider the claimant's age, education, or work experience. 20 C.F.R. § 416.920(c). If the Commissioner determines that the impairment is medically determinable and severe, then the Commissioner will proceed to step three.

### 3. Step Three

At step three, the Commissioner determines whether the claimant's impairment meets or equals an impairment or impairments found in the "Listing of Impairments" contained in appendix 1 of 20 C.F.R. part 404, subpart P and meets the duration requirement. 20 C.F.R. § 416.920(a)(4)(iii). If the Commissioner determines that the claimant's impairment meets or equals a "listed" impairment, and satisfies the duration requirement, then the Commissioner will find the claimant to be disabled regardless of age, education, or work experience. 20 C.F.R. § 416.920(d).

If Commissioner finds that the claimant's impairment does not meet or equal a listed impairment at step three, the Commissioner will assess the claimant's residual functional capacity ("RFC"). A claimant's RFC is the most she can do in a work setting despite the limitations imposed by her impairments. 20 C.F.R. § 416.945; see Selian, 708 F.3d at 418. In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. See 20 C.F.R. § 416.945.

When evaluating medical opinion evidence to inform an RFC, an ALJ must generally give more weight to the opinion of a source who has examined a claimant than a source who has not. 20 C.F.R. § 416.927(c)(1). Similarly, an ALJ must generally give more weight to the opinion of a source who treated a claimant than a source who did not. 20 C.F.R. § 416.927(c)(2). If an ALJ finds a treating source's opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [] not inconsistent with the other substantial evidence" in the record, the ALJ must give that opinion controlling weight under the so-called "treating physician rule." Id. That rule recognizes that treating physicians are "most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." Id. If the ALJ finds the opinion of a treating physician either absent or not controlling, the ALJ must then weigh all medical and non-medical evidence in the record. See 20 C.F.R. § 416.945(a)(3). Moreover, while medical sources may provide opinions concerning the claimant's specific functional limitations, the ALJ is ultimately tasked with determining a claimant's RFC based on the record as a whole. See 20 C.F.R. §§ 416.927(d)(2), 416.945(a)(3), 416.946(c).

### 4. Step Four

At step four, the Commissioner must determine whether the claimant's RFC permits the claimant to perform his or her "past relevant work." 20 C.F.R. § 416.920(a)(4)(iv). Past relevant work is "work that [the claimant] ha[s] done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it." 20 C.F.R. § 416.960(b)(1). If the claimant can perform his or her past relevant work, the claimant is not

disabled. 20 C.F.R. § 416.920(f). If the claimant cannot perform his or her past relevant work, or does not have past relevant work, the Commissioner will move to step five.

### 5. Step Five

At step five, the burden shifts to the Commissioner to determine whether the claimant can perform "alternative occupations available in the national economy" in light of his or her RFC and vocational factors of age, education, and work experience. Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995) (quoting Dixon v. Heckler, 785 F.2d 1102, 1103 (2d Cir. 1986)); see also 20 C.F.R. § 416.920(a)(4)(v). If the claimant can transition to other work that "exist[s] in significant numbers in the national economy," the claimant is not disabled; if the claimant cannot transition, the Commissioner must find the claimant disabled. 20 C.F.R. §§ 416.920(g)(1), 416.960(c).

### C. The ALJ's Duty to Develop the Record

Because benefits proceedings are non-adversarial in nature, "the social security ALJ, unlike a judge in a trial, must on behalf of all claimants affirmatively develop the record." Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 508-09 (2d Cir. 2009) (internal quotation marks omitted); see also Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999) ("Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." (citation omitted)). As such, the ALJ has a duty to obtain additional information from a treating physician where the claimant's medical record is inadequate. See Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998) ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] *sua sponte*." (citation omitted)).

Therefore, even though the court will afford the ALJ's determination substantial deference, a remand for further findings may be appropriate where the ALJ does not fulfill his or

her affirmative obligation to develop the record. See Butts v. Barnhart, 388 F.3d 377, 386 (2d Cir. 2004) ("[I]n cases where the ALJ fail[s] to develop the record sufficiently to make appropriate disability determinations, a remand for further findings that would so plainly help to assure the proper disposition of the claim is particularly appropriate." (internal quotation marks and citation omitted)). This duty is heightened in the case of *pro se* plaintiffs. See Grint v. Comm'r of Soc. Sec., 15-cv-6592 (KAM), 2018 WL 1902335, at *7 (E.D.N.Y. Apr. 20, 2018); Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999); accord Moran v. Astrue, 569 F.3d 108, 112-13 (2d Cir. 2009).

## II.     The ALJ's Decision

The ALJ issued a decision on June 27, 2017, holding that Diaz was not disabled within the meaning of the Social Security Act according to an evaluation under the five-step analysis under 20 C.F.R. § 416.920(a). Id. at 12-32. At step one, the ALJ found that Diaz had not engaged in substantial gainful activity since her June 22, 2014, SSI application date. Id. at 17.

At step two, the ALJ found that Diaz had the severe impairments of "fibromyalgia, bilateral carpal tunnel syndrome, obstructive sleep apnea, degenerative disc disease of the cervical spine, temporomandibular joint syndrome, arthritis of the knees, hypothyroidism, sinusitis, cervicalgia/neck pain, asthma, headaches, depression, anxiety, and obesity." Id. at 17-18.

At step three, the ALJ found that Diaz did "not have an impairment or combination of impairments" meeting or equaling "the severity of one of the listed impairments of 20 CFR Part 404, subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926)." Id. at 18-20. The ALJ gave specific consideration to Listings 1.02 ("Major dysfunctions of a joint(s) (due to any cause)") and 1.04 ("Disorders of the spine"). Id. at 18.

Before proceeding to step four, the ALJ determined Diaz's RFC:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except that the claimant can engage in frequent handling and fingering with the bilateral hands. She can frequently flex, extend and rotate the neck; occasionally balance, frequently stoop and crouch, but she cannot climb ladders, ropes or scaffolds, or work in an environment where she would be exposed to unprotected heights and must avoid concentrated exposure to dust, fumes, and noxious gases. The claimant can understand remember [*sic*] and carryout simple work and adapt to routine workplace changes.

Id. at 20. In determining Diaz's RFC, the ALJ considered her complaints of pain and statements about her own limitations. Id. However, the ALJ found that Diaz's "statements concerning the intensity, persistence and disabling effects of these symptoms" were "not consistent with the totality of the medical evidence of record." Id. at 21.

At step five of the analysis, and based on consideration of Diaz's age (47 on the date the application was filed), education (at least a high school education), work experience, and residual functional capacity, the ALJ determined that jobs existed in significant numbers in the national economy that Diaz could perform. Id. at 26. For these reasons, the ALJ concluded that Diaz had not been disabled since June 23, 2014. Id. at 27.

III. **Analysis**

Plaintiff moves to vacate the Commissioner's determination and for remand. The Commissioner moves for judgment on the pleadings because the conclusion that Diaz retained the ability to perform a range of light work with some non-exertional limitations, and could perform work that "exist[s] in significant numbers in the national economy, was supported by substantial evidence and free of legal error.

## A. Treating Physician Rule

The ALJ's decision to deny Diaz benefits largely hinged on his refusal to give controlling weight to the opinions of Diaz's treating physicians, Dr. Tolis and Dr. Faskowitz. First, the ALJ declined to assign controlling weight to Dr. Tolis's opinions. Dr. Tolis stated, in a January 2016 letter, that Diaz was unable to work due to fibromyalgia with chronic pain. AR at 440. The ALJ stated that this opinion was a "vague assessment, poorly supported by the medical evidence." Id. at 25. Second, Dr. Tolis opined that in a July 2016 questionnaire that Diaz was unable to work due to depression/anxiety and was limited to a sedentary range of physical motion: lifting 10 pounds occasionally, standing or walking 2 hours a day, no pushing or pulling, and sitting for six hours a day. Id. at 441-42. The ALJ stated that these opinions were "poorly supported by the reports at 5F, 6F, and 13F," which are Dr. Tolis's treatment notes. Id. at 25.

Second, the ALJ declined to assign controlling weight to Dr. Faskowitz's opinion. Dr. Faskowitz completed several assessments, essentially limiting Diaz to significantly less than the full range of sedentary work. The ALJ determined that this assessment was properly afforded "very little weight" as it was "poorly supported by [Dr. Faskowitz's] treatment notes." Id. at 25. Specifically, the ALJ noted that Dr. Faskowitz's opinion was not supported by the results of the physical exams "in Exhibits 13F 5, 9, 14, 17, 36, 47, 48, 54, 55, 71, 74; 5F 10, 16; and 6F 9, 13." Id. Dr. Faskowitz did not reply to a request for supplemental information. Id.

The Social Security regulations require the ALJ to give "controlling weight" to the opinions of "treating sources" when those opinions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence." 20 C.F.R. § 416.927(c)(2). As discussed above, treating sources "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's]

impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations." Id.

"The failure to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." Greek v. Colvin, 802 F.3d 370, 375 (2d Cir. 2015) (internal quotation marks omitted) (quoting Burgess v. Astrue, 537 F.3d 117, 130 (2d Cir. 2008)). Even if the treating physician's opinion is contradicted by other substantial evidence, it is "entitled to some extra weight . . . because the treating source is inherently more familiar with a claimant's medical condition than are other sources." Schisler v. Bowen, 851 F.2d 43, 47 (2d Cir. 1988). But "the less consistent that opinion is with the record as a whole, the less weight it will be given." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999).

When an ALJ does not afford "controlling weight" to a treating physician's opinion on the nature and severity of a claimant's disability, the ALJ must set forth his or her reasons for the weight assigned to a treating physician's opinion. 20 C.F.R. § 416.927(c)(2); Halloran, 362 F.3d at 32-33. Failure to provide "good reasons" for disregarding a treating physician's opinion is grounds for remand, though where an ALJ comprehensively sets forth the reasons for the weight given to a treating physician's opinion, the ALJ's determination will be upheld. See Halloran, 362 F.3d at 32-33 (citation omitted) (concluding that ALJ properly determined that treating physician should not be afforded controlling weight where that opinion was inconsistent with other substantial evidence in the record). To override the opinion of a treating physician, an ALJ must follow a structured evaluative procedure and explain his decision. See Selian, 708 F.3d at 418; Rolon v. Comm'r of Soc. Sec., 994 F. Supp. 2d 496, 506 (S.D.N.Y. 2014). The ALJ must explicitly consider: (1) the length of the treatment relationship and the frequency of the

examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) the consistency of the treating physician's opinion with the record as a whole; (5) the specialization of the physician in relation to the condition being treated; and (6) any other significant factors. 20 C.F.R. § 416.927(c)(2)-(6). The ALJ's consideration of these factors must be evident from the ALJ's decision, as the claimant is entitled to an explanation as to why the ALJ did not credit the findings of a treating physician. See Elliott v. Colvin, 13-cv-2673 (MKB), 2014 WL 4793452, at *15 (E.D.N.Y. Sept. 24, 2014) ("The ALJ is not required to explicitly discuss the factors, but it must be clear from the decision that the proper analysis was undertaken."); Gunter v. Comm'r of Soc. Sec., 361 F. App'x 197, 199 (2d Cir. 2010) ("Before an ALJ may elect to discredit the medical conclusions of a treating physician, she must explicitly consider" the factors specified in the regulation.). Accordingly, remand is appropriate when the ALJ fails to "comprehensively set forth his reasons for the weight assigned to a treating physician's opinion." Burgess, 537 F.3d at 129-130 (quoting Halloran, 362 F.3d at 33) (internal alterations omitted).

Here, although the ALJ found that both Dr. Tolis's opinions and Dr. Faskowitz's opinions were not entitled to controlling weight because they were inconsistent with the objective and opinionative evidence in the record, he did so without providing any explanatory detail beyond a summary citation to other parts of the record. To the extent the ALJ held that the treating source opinions were entitled to "little" or "very little" weight, the only explanations offered are nonspecific. While the ALJ opines that Dr. Tolis's and Dr. Faskowitz's opinions are inconsistent with the record as a whole, that factor is only one of the relevant regulatory factors an ALJ must use to determine what weight to assign the opinion of a treating source. Madera v. Comm'r of Soc. Sec, 15-cv-3127 (WHP) (JFC), 2016 WL 4081131, at *12 (S.D.N.Y. May 9,

2016), report and rec. adopted, 2016 WL 4074445 (S.D.N.Y. May 29, 2016). Thus, even if the Court agreed with the ALJ that Dr. Tolis's and Dr. Faskowitz's opinions were not supported by substantial evidence, it would nonetheless remand this case because the ALJ failed to adequately explain his reasons for assigning "little" or "very little" weight to these treating source opinions. See Laracuente v. Colvin, 212 F. Supp. 3d 451, 465-66 (S.D.N.Y. 2016) ("ALJs are required to specify the ways in which a treating physician's opinion is inconsistent with the record and should specifically discuss the factors . . . when considering the weight to assign to a treating physician's opinion."). The ALJ's failure to address the relevant factors in tandem with the lack of reasons supplied for the weight given to the treating source opinions weigh in favor of remand. See Halloran, 362 F. 3d at 33 ("We do not hesitate to remand when the Commissioner has not provided good reasons for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." (internal quotation marks omitted)).

Contrary to the ALJ's assessment, the evidence from the treatment notes in the record were not inconsistent with Dr. Tolis's opinion that Diaz could lift and carry less than 10 pounds, could stand and walk no more than 2 hours a day, could not push or pull, and could sit for six hours a day. A person with full range of motion, an abnormal gait, and no acute distress during a brief examination with a treating physician might nevertheless have difficulty carrying large amounts of weight and standing, walking, and sitting for long periods of time without breaks. In addition, evidence from Dr. Faskowitz's own treatment notes are not inconsistent with his conclusion that Diaz could not work due to pain from fibromyalgia. For example, in a "Fibromyalgia Medical Source Statement" dated September 6, 2016, Dr. Faskowitz opined that

Diaz met the diagnostic criteria for fibromyalgia. Id. at 582. According to the questionnaire, Diaz experienced pain in the lumbosacral, thoracic, and cervical spine, chest, shoulders, arms, hand/fingers, hips, legs, knees, ankles, and feet, and that Diaz was severely limited in terms of how much she was able to stand, sit, walk, grasp, and reach. Id. at 583. The ALJ also failed to evaluate the length and nature of the treating relationship between Diaz and Dr. Faskowitz, as well as the fact that Dr. Faskowitz's was Diaz's "pain management doctor." Id. at 21.

It also bears emphasizing that the ALJ, without much justification, appears to have afforded more weight to some of the opinions of the one-time consultative examiner, Dr. Grabon, than to those made of the treating sources. AR at 24. Although the conclusions of a consultative examiner may override those of a treating source, see Mongeur v. Heckler, 722 F. 2d 1033, 1039 (2d Cir. 1983) (citation omitted), an ALJ should use care before relying too heavily on the findings of a one-time consultant, see Selian, 708 F. 3d at 419 (citation omitted). This is because consultative examinations are "often brief, are generally performed without the benefit or review of [the] claimant's medical history and, at best, only give a glimpse of a claimant on a single day. Often, consultative reports ignore or give only passing consideration to subjective symptoms without stated reasons." Cruz v. Sullivan, 912 F. 2d 8, 13 (2d Cir. 1990) (internal quotation marks and citation omitted). The ALJ retained the burden to provide justifications for privileging the opinion of the consultative source—specifically that Diaz had only "mild limitations in bending, lifting, prolonged standing, and excessive neck turning," AR at 24 (emphasis added)—above conflicting opinions of the treating sources in concluding that Diaz was not disabled. Morales v. Berryhill, 14-cv-2803 (KMK)(LMS), 2018 WL 679566, at *16 (S.D.N.Y. Jan. 8, 2018), report and rec. adopted sub nom. Morales v. Comm'r of Soc. Sec., 2018 WL 679492 (S.D.N.Y. Feb. 1, 2018) (citations omitted). In the instant case, the ALJ relied

on the same cursory analysis in assigning "some weight" to the consultative examiner that he used to assign "little weight" to Diaz's treating sources. See id.

Because the ALJ did not properly apply the treating source rule, I find that vacating the Commissioner's decision and remanding the case to allow the ALJ to conduct the proper analysis is warranted.

## CONCLUSION

For the reasons set forth above, Diaz's motion for judgment on the pleadings is GRANTED. The Commissioner's denial of benefits is VACATED, and REMANDED to the Commissioner for proper analysis in line with the treating physician rule. The Commissioner's cross-motion for judgment on the pleadings, ECF No. 15, is DENIED. Plaintiff's motion for pro bono counsel is also DENIED and the Court of Clerk is respectfully directed to terminate ECF No. 3.

In light of reduced operations due to the COVID-19 pandemic, the Court respectfully requests that the Defendant mail a copy of this Opinion & Order to Plaintiff and file an affidavit of service on the docket.

**SO ORDERED.**

SARAH NETBURN
United States Magistrate Judge

DATED:      April 8, 2020
            New York, New York